# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

KIRBY OFFSHORE MARINE PACIFIC, LLC,

          Plaintiff,

v.

EMERALD SERVICES, INC.,

          Defendant.

No. C17-0224RSL

MEMORANDUM OF DECISION

This matter was heard by the Court in a three day bench trial commencing on February 5, 2018. Plaintiff, Kirby Offshore Marine Pacific, LLC, filed this lawsuit seeking to recover losses associated with cargo contamination aboard the tank barge KAYS POINT from defendant Emerald Services, Inc., which had recently cleaned the tanks. Plaintiff has asserted claims of negligence, breach of implied and express warranties of workmanlike performance, and breach of contact.

## FINDINGS OF FACT

By a preponderance of the evidence, the Court finds as follows:

In the spring of 2016, plaintiff intended to install a barrel rack on the deck of the KAYS POINT above tanks 4S and 5S. Because the related welding work had the potential to breach the decking, plaintiff hired defendant to clear twelve cargo tanks of gas. When defendant's crew arrived at the KAYS POINT, the supervisor spoke to the tankerman and confirmed that defendant was to make the tanks safe for entry and safe for hot work. This type of cleaning

MEMORANDUM OF DECISION

involves pressure washing the floor and first plate (approximately six to eight feet up the side walls) with soapy water and vacuuming out the debris and water. Loose scale, sediment, and imperfections in a tank can hold petroleum-based contaminants and flammable materials: the cleaning crew's goal when working toward a gas free certification is to minimize any remaining scale and residue. When the supervisor thinks the tank is sufficiently clean, the marine chemist tests the atmospheric conditions in the tank. Whether defendant has adequately performed the services for which it was hired is objectively verifiable when the assignment is to clean for hot work: the chemist either certifies that the tank is safe for workers and for hot work, or he does not.[1]

In this case, the marine chemist, who was known to defendant's crew as something of a stickler, requested that defendant remove and clean the deep well inspection blinds in the bottom of the tanks. Defendant had, on one or two prior occasions since 2010, been requested to open the blinds. One of the two supervisors defendant had on site, Serey Rath, was aware that plaintiff had recently instituted a policy that precluded the tankerman, Brian McDonald, from going into the tanks until they had been certified as safe for entry.[2] Rath therefore requested that McDonald provide the tools defendant would need to open the blinds. Defendant opened the blinds, returned the tools to McDonald's tool box, cleaned the tanks, and waited for the marine chemist to complete his testing. Neither of the supervisors entered the tanks to check on the work, but the crew on the KAYS POINT had almost 100 years of combined experience, and the leads

---

[1] Other types and levels of cleaning, including a "belly wash," "clean for clean," and "clean for change of cargo," were mentioned at trial but are not at issue here. A gas free cleaning costs approximately $50,000-$60,000. A change or product cleaning can cost a couple hundred thousand dollars.

[2] In November 2015, apparently as a result of a mishap on another vessel, plaintiff had instituted a policy precluding its employees from entering tanks at any time, even if the area had been certified as safe by a marine chemist. As far as Rath knew, however, the bar applied only until the tank was deemed safe. There is no indication that plaintiff took steps to communicate its new policy to defendant as a general matter or that McDonald explained the policy to Rath in the context of this particular engagement.

MEMORANDUM OF DECISION -2-

understood what needed to be done. The chemist certified that the tanks were safe for workers and safe for hot work. The chemist noted on the certificate, which McDonald signed and posted on board the vessel, that the inspection blinds remained open. Defendant removed its equipment from the barge and departed. McDonald closed and secured the cargo tanks. McDonald did not go or look into the tanks before securing them.

Between April 10 and April 16, plaintiff transited the barge to another location in Tacoma to do the hot work and delivered the barge for the 2016 season to Crowley Petroleum Distribution, Inc. under a long term charter agreement. On April 16 and 17, the barge shuttled between Seattle and Tacoma, where various fuel products were loaded into the twelve uncoated steel tanks. McDonald, as the tankerman, oversaw the loading of the barge and the testing of the product. The tanks were never opened during the loading process, but representatives from Crowley and plaintiff looked through the sight glasses at the top of the tanks with a flashlight. They did not notice anything unusual. The fuel products were tested at three points in the loading process. A header sample was taken as the product moved from the storage unit to the vessel in order to make sure the source is not contaminated. As each tank was filled to a depth of approximately two feet, the loading process was stopped and a sample was taken for testing. Only after those "first in" samples came back satisfactorily did loading resume. Once the tanks were filled, another sample was taken and sent out for testing. That testing regimen took longer, approximately 155 minutes. The tanks that were filled in Seattle passed all three tests. The four tanks that were filled with JP-8 (military grade jet fuel) in Tacoma passed the header and first-in tests, but had an issue with the long-term test. When new samples were taken and retested, they passed. The KAYS POINT departed Tacoma en route to Dutch Harbor, Alaska.

At some point during the journey, Crowley informed plaintiff that the JP-8 had tested positive for particulate contamination. The barge was redirected to Valdez for further testing and unloading/reloading if necessary. When opened, three of the four tanks that contained JP-8 failed a visual inspection (all three had visible particulate contamination and one also had water

MEMORANDUM OF DECISION -3-

contamination). When sampled, all four tanks -- 2P, 2S, 5P, and 5S -- failed. All of the jet fuel on the barge, including the Jet-A fuel contained in tank 4P, was offloaded. In the process, the tankerman noticed that the fuel levels in tank 6P, which held ultra low sulfur diesel ("ULSD"), were dropping and a vacuum was being created. The offloading was stopped while potential explanations for this occurrence were investigated. Plaintiff was fairly certain that the barge's pipes were in good working condition, so it contacted defendant to ask whether the inspection blinds had been closed. Defendant's district manager checked with the crew that had worked on the KAYS POINT and reported that they had not closed the inspection blinds.

When the JP-8 was removed from the tanks, half-inch deep deposits of particulates were found on the floor of tanks 2P, 2S, and 5S, with some debris (a broken sample bottle and a wire brush) and particulates in the well sump of tank 5P. Significant scale deposits were also found on the bottom of tank 4P, where the Jet-A fuel had been stored.[3] Crowley and plaintiff expended significant funds as a result of the particulate contamination of the JP-8 and the mingling of the ULSD and JP-8 through the open inspection blinds. Crowley demanded that plaintiff reimburse it. Despite having a number of potential defenses under the terms of the Time Charter Agreement, plaintiff settled Crowley's claim and brought this lawsuit against defendant. Plaintiff suffered losses of $808,326.89 as a result of the jet fuel contamination and $145,437.47 in additional expenses arising from the open blinds.

---

[3] At one point in his Field Survey Report, Captain Mike Ahearn, a marine surveyor with Bowditch Marine, Inc., stated that there were heavy concentrations of rust particulate matter on the floor of tanks 6P and 6S, which had held the ULSD. This statement has been disregarded: it is not consistent with his more particularized statement of the condition of each individual tank, with the observations of Will Bishop, another marine surveyor who accompanied Captain Ahearn as he attended the KAYS POINT, or with the cleanup activities of NRC. Captain Ahearn's explanation for the discrepancy at trial was not persuasive.

MEMORANDUM OF DECISION -4-

# CONCLUSIONS OF LAW

**A. Negligence**

Negligence under maritime law involves the same elements as common law negligence, namely the existence of a duty, its breach, proximate cause, and damages. 1 Thomas J. Schoenbaum, Admiralty and Maritime Law 5-2, at 170 (3d ed. 2001). Plaintiff has the burden of proving negligence by a preponderance of the evidence. Marquette Transp. Co., Inc. v. La. Mach. Co., Inc., 367 F.3d 398, 402 (5th Cir. 2004). If the court finds that both plaintiff and defendant were negligent, damages will be allocated between the parties "proportionately to the comparative degree of their fault." U.S. v. Reliable Transfer Co., Inc., 421 U.S. 397, 411 (1975).

Plaintiff alleges that defendant was negligent in failing to adequately clean the tanks and failing to replace the inspection blind covers.

Defendant undoubtedly had a duty to use reasonable care in performing the services for which it was hired. Plaintiff has not, however, shown that the duty was breached. Defendant was hired to clean the tanks on the KAYS POINT so that they were gas free and could be certified as safe for hot work by a marine chemist. It did just that. The tanks were pressure washed with soapy water up to a certain height, loose scale was sprayed off and vacuumed up, the tanks were ventilated, and, after testing, the marine chemist certified the tanks as safe for hot work.

Plaintiff asks the Court to find that a breach occurred based on the facts that (a) a glass bottle and wire brush were found in the bottom of tank 5P, (b) defendant's supervisors did not enter the tanks to confirm that they were clean, and (c) oxidation particulate was found in the tanks after jet fuel was loaded into them. The first two facts raise issues that defendant's management might want to address, namely how to handle debris that is too big to be vacuumed out and the permissible level of responsibility delegated to experienced team leads. Neither establishes a breach of the duty to exercise reasonable care in cleaning to gas free, however. Nor does the later existence of rust particulate compel the conclusion that defendant's crews disembarked the vessel with half-inch deep deposits of scale on the floors. For the following

MEMORANDUM OF DECISION -5-

reasons, the evidence is simply too equivocal to conclude that defendant breached its duty of reasonable care in cleaning the tanks to gas free:

- First, the tanks passed the marine chemist's tests. Defendant's employees testified that petroleum-contaminated particulate matter is flammable and would be a source of gas fumes and that their goal was to remove any scale or residue so that they could obtain the necessary certification. The issuance of the certificate suggests that there were not piles of flammable material on the decks.

- Second, defendant's employees credibly testified regarding the tasks they performed and the results they expected when cleaning for hot work. There is no indication that any of them personally would have deemed the job done if there were piles of sediment on the floor or that they saw such piles when they left the tanks in which they were working. The tankerman did not look in the tanks before closing them and could not, therefore, testify as to their condition. There is no direct evidence of contamination between April 10th and April 17th.

- Third, the first-in tests performed in Seattle and Tacoma came back negative. If rust lay in piles on the floor of the tanks when the loading began, one would expect that those first-in tests would show the highest levels of contamination because all of the particulate would be mixed with only a small portion of the fuel at the time those samples were taken.

- Finally, there is an equally, if not more plausible, explanation for the contamination. Plaintiff did not request that defendant "clean for clean" or "clean for change of cargo," a precaution most witnesses acknowledged should be taken before jet fuel is loaded into an uncoated steel tank. As it was, approximately two-thirds of the tank walls were untouched by defendant's cleaning efforts, not because it breached its duty of care, but because it was not hired to perform the higher level of service. The oxidation particulate was found in tanks 2S, 2P, 4P, 5P, and 5S, the five tanks that contained military grade jet fuel.

Given the totality of the circumstances, plaintiff has not proven by a preponderance of the evidence that defendant failed to clean to gas free and/or failed to exercise reasonable care in

performing the services for which it was hired.

With regards to the open inspection blinds, the Court finds that defendant had no duty to close them. There is no industry standard that applies in this case, nor did the parties' course of conduct establish a duty on defendant's part. The witnesses generally acknowledged that the tankerman has the duty to ensure that the barge and tanks are suitable for their purpose and that, had plaintiff not issued its policy prohibiting employees from entering the tanks, McDonald would have checked the tanks before securing them. Plaintiff did not anticipate a situation in which its new policy would impact the services provided by third parties and made no effort to communicate the policy to defendant. While Rath was aware that plaintiff's policies had changed and that McDonald's ability to go into the tanks had been curtailed, he mistakenly believed that the prohibition lasted only until the tank was certified as safe for workers. McDonald made no effort to clarify the policy, and Rath had no reason to suspect that he was ill-informed. From Rath's perspective, he was hired to clean the tanks, not provide mechanical services, he had returned McDonald's tools after opening the blinds, and his job was complete when the marine chemist issued the certificate. While one might wish that the protagonists would confer at the end of the day to ensure that all expectations were met and all loose ends were secured, the duty to ensure that the barge was in ship shape ultimately lay with the tankerman. It was he who signed the chemist's certificate (on which the open inspection blinds were noted), controlled the tools that would be needed to close the blinds, was presumably aware that defendant's crew disembarked the ship almost immediately after obtaining the certification, and closed the tanks without looking inside. In the circumstances presented here, defendant owed no duty with regards to the blinds.

**B. Breach of Warranty of Workmanlike Performance**

Entities, such as defendant, which provide services to a vessel may be held liable "for a breach of an implied warranty of workmanlike performance that attaches to admiralty contracts under the rule of Ryan Stevedoring Co. v. Pan-Atl. S.S. Corp., 350 U.S. 124 . . . (1956)." La

Esperanza de P.R., Inc. v. Perez y Cia. de Puerto Rico, Inc., 124 F.3d 10, 16-17 (1997). Although the implied warranty does not impose the type of strict liability that often attaches to land-based warranty claims, the vessel owner does not have to prove negligence to show that a marine contractor has violated the warranty of workmanlike performance. Id. at 17. Federal maritime law governs both the construction of the terms of a service contract and the standard of performance due thereunder. Id. The Court finds that defendant performed the services for which it was hired in a workmanlike manner.

**C. Breach of Contract**

Plaintiff alleges that defendant owed a warranty of workmanlike performance under its oral and written contracts. No other contractual breach is alleged. The Court has already determined that defendant performed the services for which it was hired in a workmanlike manner.

For all of the foregoing reasons, the Clerk of Court is directed to enter judgment against plaintiff Kirby Offshore Marine Pacific, LLC, and in favor of Emerald Services, Inc.

DATED this 26th day of March, 2018.

*[signature]*
Robert S. Lasnik
United States District Judge